AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

02/03/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**F I L E D**
CLERK, U.S. DISTRICT COURT

2/3/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ram _____ DEPUTY

United States of America

v.

FERNANDO JAVIER BRENES-URBINA,

Defendant(s)

Case No. 5:23-mj-00049

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 1, 2023, in the county of San Bernardino in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ signed pursuant to Fed. R. Crim. P. 4.1*
*Complainant's signature*

Jason Putnam, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      February 3, 2023

_____
*Judge's signature*

City and state:   Riverside, California

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

AUSA: David C. Lachman (x5546)

## **AFFIDAVIT**

I, Jason A. Putnam, being duly sworn, declare and state as follows:

## **I.** **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Fernando Javier BRENES-URBINA ("BRENES-URBINA") for a violation of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances).

2.   This affidavit is also made in support of a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES") in the custody of the Drug Enforcement Agency ("DEA") in Los Angeles, California, as more fully described in Attachment A:

a.   One red Apple iPhone ("SUBJECT DEVICE 1"); and

b.   One Apple iPhone with a black case ("SUBJECT DEVICE 2").

3.   The requested search warrant seeks authorization to seize evidence, fruits or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are approximate.

## II. **BACKGROUND OF AFFIANT**

5.   I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") and have been employed as such since August 2016.  I am currently assigned to Los Angeles Field Division High Intensity Drug Trafficking Areas Group 48 ("HIDTA 48") and have been so assigned since October 2017.  HIDTA 48 investigates large-scale drug organizations operating in the Southern California area and elsewhere.  I have received specialized training on the subjects of drug trafficking and money laundering from the DEA, and I have attended the DEA Academy at Quantico, Virginia for 20 weeks.  Prior to being a DEA Special Agent, I was employed with the Cobb County Police Department from March 2013, where I attended the 20-week Police Academy.

6.   Through my training, experience, and interactions with other experienced drug trafficking investigators, I have familiarized myself with the methods employed by drug traffickers in general to smuggle, safeguard, and distribute drugs, and to collect and launder drug-related proceeds.  I am particularly familiar with methods employed by large-scale drug

trafficking organizations, and the sophisticated tactics that
they routinely use in attempts to thwart the investigation of
their drug trafficking organizations, including the utilization
of cellular telephone technology, counter surveillance
techniques, hidden vehicle compartments, elaborately planned
smuggling schemes tied to legitimate businesses, false or
fictitious identities, and coded communications and
conversations.  In conducting these investigations, I have used
a variety of investigative techniques and resources, including
surveillance, confidential sources, telephone toll analysis, and
wire communications analysis in other Title III wiretap
investigations.

### III. **SUMMARY OF PROBABLE CAUSE**

7.   In July 2022, HIDTA 48 learned that a Mexico-based
drug broker known as "CHUY" was brokering sales of large amounts
of fentanyl pills in the Los Angeles area.  On August 26, 2022,
CHUY brokered the sale of 5,000 fentanyl pills to a confidential
source working with DEA in Cerritos, California.  DEA Southwest
Laboratory testing confirmed that the pills contained fentanyl.

8.   Between August and October 2022, CHUY offered to
arrange the sale of one million fentanyl pills in exchange for
$750,000, but two planned transactions fell through when the
parties could not agree on the logistics of the exchange.

9.   In December 2022, CHUY confirmed that he could arrange
the sale of 100,000 fentanyl pills to a DEA confidential source.
On or about January 22, 2023, CHUY and the confidential source
agreed that the drug deal would take place the following week.

On February 1, 2023, law enforcement agents arrested BRENES-URBINA after he showed up at the agreed-upon location in Ontario, California, with approximately 100,000 blue pills imprinted with an "M" on one side and "30" on the other side, which based on my training and experience, I believe to be counterfeit oxycodone pills laced with fentanyl.

10.   BRENES-URBINA used two different telephone numbers to coordinate regarding the fentanyl deal.  SUBJECT DEVICE 1 was seized from BRENES-URBINA's person at the time of his arrest, and SUBJECT DEVICE 2 was found in the center console of the car BRENES-URBINA was driving.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11.   Based on my review of law enforcement reports, conversations with other law enforcement agents and confidential sources, and my own knowledge of the investigation, I am aware of the following:

**A.   Background of Investigation**

12.   In July 2022, a confidential source working with DEA ("CS-1")[1] told HIDTA 48 that a Mexico-based drug broker known as "CHUY" was brokering sales of large amounts of fentanyl pills in the Los Angeles, California area.  I know, based on my training and experience, that a "broker" is someone who puts a drug buyer

---

[1] CS-1 has been working with DEA for approximately seven months.  CS-1 is working for financial compensation.  CS-1 has no known criminal history.  CS-1 is working on multiple investigations, and the information provided by CS-1 has been corroborated and has been found reliable.

in contact with a drug supplier.  CS-1 provided to DEA agents a
Mexican telephone number ending in -2318 for CHUY.

13.  In August 2022, under the direction of investigators,
a second confidential source working with DEA ("CS-2"),[2] whom
CHUY believed to be a drug customer, began corresponding with
CHUY via WhatsApp and phone calls at the -2318 phone number.
These communications, which were recorded, took place in
Spanish.[3]  On August 8, 2022, CS-2 called CHUY at the -2318
number using WhatsApp.  Based on a summary of the call provided
to me by Spanish-speaking agents, I understand that the
following took conversation took place.  CS-2 told CHUY, "I am
calling on behalf of Parcero," which is slang for "friend" in
Spanish.  CS-2 explained, "I am into the bills [referring to
money laundering] and I have customers who are into the candies
[referring to fentanyl], and this guy tells me you are the guy
for that."  CS-2 told CHUY that the pills were "going to the

_____

[2] CS-2 began working with the DEA in May 2014 after s/he was
charged with conspiracy to distribute controlled substances.  In
December 2015, CS-2 also began acting as a confidential source
with the Hawthorne Police Department.  As a result of his/her
cooperation, CS-2 has received judicial consideration for the
drug conspiracy charge and deferred action on his/her
immigration status.  CS-2's cooperation with DEA was completed
in June 2018.

Starting in August 2019, CS-2 was re-activated with the DEA
and has been working with HIDTA 48 for monetary compensation.
Since August 2019, CS-2 has assisted in investigations resulting
in the seizure of approximately 10 kilograms of fentanyl, 120
kilograms of cocaine, 100,000 fentanyl pills, 500 pounds of
methamphetamine, and $400,000.00.  CS-2 has been financially
compensated approximately $250,000 for his/her assistance in
these investigations.

[3] All translations included in this affidavit are
preliminary, such that final transcripts may reflect changes
after additional review.

Leaf [referring to Canada], it has to be good quality." CHUY responded, "It's guaranteed, good quality."

**B. CHUY Brokers the Sale of 5,000 Fentanyl Pills on August 26, 2022**

14. Based on law enforcement agents' review of the recorded communications between CHUY and CS-2 from August 8, 2022, to August 26, 2022, CHUY offered to sell 5,000 fentanyl pills to CS-2 for 75 cents per pill. CS-2 provided CHUY with the contact information for a third confidential source working for DEA ("CS-3"),[4] whom CS-2 referred to as his/her "driver" and designated as the person who would pick up the fentanyl pills from one of CHUY's associates. On August 26, 2022, an unidentified female met CS-3 in the parking lot at 239 Los Cerritos Center, Cerritos, California, and sold approximately 5,000 counterfeit M-30 pills to CS-3 for $3,750. The pills, which weighed 643.9 net grams, tested positive at the DEA Southwest Laboratory for the presence of fentanyl.

---

[4] CS-3 began working with the DEA in November 2021. CS-3 began working with the DEA after CS-3 pleaded guilty to possession with intent to distribute methamphetamine. CS-3 is working with the DEA in exchange for a potential sentence reduction in that case as well as deferred action on CS-3's immigration status. CS-3's criminal history includes convictions for possession of burglary tools, burglary, driving without a license, and providing false identification to a police officer. CS-3's criminal history also includes arrests for vehicle theft, grand theft, burglary, use of another person's identification, conspiracy to commit a crime, and forgery. Information provided by CS-3 has been corroborated and proven reliable.

**C.   CHUY Discusses Additional Fentanyl Deals Between September 2022 and December 2022**

15.   Beginning on September 7, 2022, CHUY and CS-2 discussed a potential deal for one million fentanyl pills.  As I understand from Spanish-speaking agents who reviewed the recorded calls, CS-2 explained to CHUY that CS-2 was interested in purchasing large amounts of pills at wholesale prices, and CHUY acknowledged that he could supply one million pills to CS-2.  During these recorded communications, CHUY telephonically introduced a man known to CS-2 only as "Sergio," who discussed the logistics of the sale of one million fentanyl pills with CS-2.  CS-2 did not have direct calls with Sergio.  Rather, CHUY would call both CS-2 and Sergio so that the three of them would be on three-way calls together.

16.   Based on my discussions with CS-2 and Spanish-speaking agents, on September 28, 2022, Sergio confirmed on a recorded phone call that he would be able to provide one million fentanyl pills for sale to CS-2 for $750,000.  On September 30, 2022, CS-2 and CHUY agreed on a recorded call that the sale would take place on October 5, 2022.  CHUY told CS-2 that a "guy" working for Sergio would bring at least "100," which I believe to mean 100,000 fentanyl pills, to sell to CS-2 so that CS-2 and Sergio's guy could build trust with each other.  CHUY stated that the guy would then bring out "200-300" at a time to sell to CS-2.

17.   On October 4, 2022, CHUY telephonically introduced a new fentanyl source known as "Chino" to CS-2 in a recorded call.

Based on my discussions with CS-2 and Spanish-speaking agents, I understand that CHUY, Chino, and CS-2 agreed that Chino would take the place of Sergio as the source of the pills for the deal for one million fentanyl pills that was set to take place the following day, on October 5, 2022.  On October 5, 2022, CHUY provided the telephone number of a drug courier to CS-2.  Based on my discussions with CS-2 and Spanish-speaking agents, I understand that the plan was that CS-2 would meet the drug courier later that day and that drug courier would deliver one million fentanyl pills to CS-2 on Chino's behalf for $750,000. On October 5, 2022, CS-2 and CS-3 met the drug courier at a Denny's in Lakewood, California, to discuss the logistics of the drug deal.  During that meeting, CS-2 and CHUY continued to negotiate the logistics of the exchange on recorded calls, but they could not reach agreement and terminated the deal planned for that day.

18.  According to law enforcement agents' review of recorded phone calls, between October 6, 2022 and October 20, 2022, CS-2 and CHUY continued negotiations for the sale of one million fentanyl pills to CS-2.  On a recorded call with CS-2 on October 20, 2022, CHUY introduced CS-2 to an unidentified source of supply ("SOS") for fentanyl in the Los Angeles area.  On another recorded call that same day, CHUY told CS-2 that a drug courier working for this SOS could bring 100,000 fentanyl pills on behalf of the SOS to sell to CS-2.  CS-2 responded to CHUY that CS-2 would not buy the first 100,000 pills until the drug courier could confirm that he had one million pills available

for sale.  On October 20, 2022, CS-2 met with a drug courier working for this SOS at a Starbucks in Hawaiian Gardens, California, to discuss the logistics for the drug deal.  CS-2 and CHUY maintained communications throughout the day, but they again could not agree about the logistics of the exchange, and CS-2 terminated the planned exchange.

19.  After the second failed drug transaction, CS-2 and CHUY remained in communication.  In December 2022, CS-2 asked CHUY how many fentanyl pills he could sell, as CHUY had been unable to supply one million fentanyl pills.  A few days later, CHUY confirmed that he could sell 100,000 pills to CS-2.

**D.   CHUY Agrees to Broker the Sale of 100,000 Fentanyl Pills to CS-2**

20.  CS-2 and CHUY continued discussions about the sale of 100,000 fentanyl pills to CS-2.  Based on my discussions with CS-2 and summaries of the calls from Spanish-speaking agents, on a phone call on January 21, 2023, CHUY and CS-2 tentatively agreed that the deal for the 100,000 pills would take place on January 27, 2023, at the previously agreed-upon price of 75 cents per pill.  On a recorded phone call on January 22, 2023, CS-2 informed CHUY that CS-2 could not do the deal on January 27 but that CS-2's "driver," referring to CS-3, would be in the area around February 1 and could pick up the pills then.  CHUY and CS-2 agreed to postpone the deal until February 1, 2023.

21.  At approximately 12:09 p.m. on January 30, 2023, at the direction of investigators, CS-3 called CHUY at the -2318 number and stated that CS-3 was calling on CS-2's behalf.  Based

on my discussions with CS-3 and Spanish-speaking agents, CS-3 told CHUY that CS-3 would arrive in the Los Angeles area the following afternoon and would be doing "errands" for CS-2.  CS-3 asked CHUY for the phone number of CHUY's "helper" so that the "helper" could assist CS-3.  CHUY responded that CS-3 would only receive the phone number closer to the time of the planned drug deal, either on the evening of January 31 or on the day of the deal.  After CS-3 insisted on speaking to the "local guy" before the deal, CHUY told CS-3 to hold on and not hang up.  According to CS-3, CS-3 heard a ring tone sound while waiting on the line for CHUY, and then CHUY put an unidentified man on the phone.  CHUY told the man that CS-3 was coming to "pick-up" for CS-2 and wanted to get a phone number that day or, at the latest, by the evening of January 31.  The unidentified man responded that he does not like to pass out the phone number that early on.

22.  On January 31, 2023, at approximately 10:27 a.m., CS-3 contacted CHUY and explained that CS-3 would be arriving later that day and needed to be in communication with "those people," referring to CHUY's Los Angeles-based source of supply.  After a series of calls between CS-3 and CHUY, CHUY contacted CS-3 at approximately 3:59 p.m. and set up what CS-3 understood to be a three way call with an individual CHUY referred to as "Sergio." Sergio asked if CS-3 was the person who was going to pick up the "candies."  After CS-3 responded affirmatively, Sergio stated, "my chauffeur got into an accident and does not have a car right now," and asked whether CS-3 would be able to meet the "chauffeur" in Ontario, California.  CS-3 asked Sergio if this

person had the 100,000 pills, and Sergio replied, "yes."  CS-3
said that CS-3 was coming from the Long Beach area and would
have to ask CS-2 for permission to go to Ontario.

23.   Shortly thereafter, CHUY called CS-2 and explained
that CS-3 would need to go to the Ontario area.  CS-2 replied
that CS-3 would charge CS-2 more money for having to go to
Ontario and that CS-2 would not allow for CS-3 to go to Ontario
until CS-3 received a phone number for the local contact.  CHUY
stated he understood.  CHUY added that he wanted to front CS-2
additional pills for CS-2 to sell on CHUY's behalf in New York.

24.   CHUY called CS-3 again on January 31, 2023, and stated
that CS-3 would soon receive a phone call from a caller who
would say he/she was "calling on behalf of CHUY."  CHUY stated
that there would be a total of "14 pieces," which based on my
training and experience I believe to refer to 14 packages, each
containing 10,000 pills, for a total of 140,000 pills.  CS-3
asked whether the order was for "100," which CHUY acknowledged.
CHUY explained that the extra "4" pieces that CS-3 would be
transporting were for CHUY.  After that call, CHUY called CS-3
back and stated that "they" may add an extra "2," referring to
20,000 pills, for CHUY.

E.   CS-3 Confirms the Fentanyl Deal with BRENES-URBINA

25.   At approximately 7:00 p.m. on January 31, 2023, CS-3
received a phone call from a telephone number ending in -6568
and spoke to a man later identified as Fernando Javier BRENES-
URBINA.  Based on conversations with CS-3 and Spanish-speaking
agents, BRENES-URBINA stated that he was calling on behalf of

"CHUY" about the "candies" and wanted to arrange to meet with
CS-3 the following day.  CS-3 told BRENES-URBINA that CS-3 was
planning to arrive around 11 a.m. or 12 p.m. the next day, and
would be coming to Ontario.  BRENES-URBINA then told CS-3 that
BRENES-URBINA would call CS-3 back on a different number.  A few
minutes later, BRENES-URBINA called CS-3 using a telephone
number ending in -4662 and told CS-3 that this number was better
because BRENES-URBINA always had this phone on him.

26.  At approximately 8:14 p.m., CHUY texted CS-3 and
provides a phone number ending in -1191 with a message in
Spanish stating, "[get] with Nipsy to pick up the boxes."  At
approximately 8:42 p.m., CHUY called CS-3 to explain that
someone would bring the extra pills after CS-3 buys the "100."
CS-3 was unable to reach anyone at the -1991 number.

27.  At approximately 9:01 p.m., CS-3 called BRENES-URBINA
using the -6568 number and asked what BRENES-URBINA would be
bringing the following day.  BRENES-URBINA initially said "12"
and then said "75."  BRENES-URBINA appeared confused and told
CS-3 that BRENES-URBINA would call his (BRENES-URBINA's) boss to
confirm.  A few minutes later, BRENES-URBINA called CS-3 back
using the -6568 number and stated that deal was for "100," the
"other guy" would have the "40," and that CS-3 would give
BRENES-URBINA the "75,000."

**F.  Law Enforcement Agents Seize Approximately 100,000
Fentanyl Pills from BRENES-URBINA on February 1, 2023**

28.  At approximately 9:28 a.m. on February 1, 2023, CS-3
called the -6568 number and spoke with BRENES-URBINA.  Based on

my discussions with CS-3 and Spanish-speaking agents, CS-3 told BRENES-URBINA that CS-3 would arrive in Ontario at "around noon."  BRENES-URBINA asked CS-3 if CS-3 had a location for their meeting, and CS-3 replied that CS-3 would advise BRENES-URBINA of the location once CS-3 was in the area.

29.  At approximately 11:30 a.m., CS-3 received a phone call from BRENES-URBINA at the -6568 number and told BRENES-URBINA that CS-3 put "Ontario Mills" in the GPS and that CS-3 would arrive at about 12:15.  BRENES-URBINA confirmed that he would be the person making the delivery.  CS-3 told BRENES-URBINA that CS-3 will be "coming ready," and BRENES-URBINA confirmed that he would also "be ready."  CS-3 told BRENES-URBINA that CS-3 would call with a specific location once CS-3 was in the area.  A few minutes later, CS-3 received a call from CHUY, who asked CS-3 how things were going.  CS-3 told CHUY that CS-3 had spoken with BRENES-URBINA and that they were set to meet at 12:15.

30.  At approximately 12:15 p.m., members of DEA HIDTA 48 and Fullerton Police Department ("FPD") established surveillance in the vicinity of a Courtyard by Marriott hotel located at 11525 Mission Vista Drive in Rancho Cucamonga, California.  Law enforcement searched CS-3 prior to the deal, which resulted in negative findings, and equipped CS-3 with an audio and video recording device.  At approximately 12:25 p.m., CS-3 drove to the Courtyard by Marriott hotel and parked in the hotel parking lot.

31.   At approximately 12:28 p.m., CHUY called CS-3 and asked if CS-3 was "there with the guy."   CS-3 replied that CS-3 was about to tell BRENES-URBINA that CS-3 was at the meeting location and that CS-3 would call CHUY when BRENES-URBINA arrived.   CS-3 then sent a text message to BRENES-URBINA at the -6568 number stating, "11525 Mission Vista Dr Rancho Cucamonga."

32.   At approximately 12:30 p.m., CS-3 received a phone call from the -6568 number, and BRENES-URBINA asked, "everything good friend?"   CS-3 replied that CS-3 had already sent the address, and BRENES-URBINA confirmed that he had just received it and was on his way and about 10 minutes away.   CS-3 then received a call from CHUY, who asked if CS-3 had met with "the guy" yet.   CS-3 stated that they had not met yet but that CS-3 had already given BRENES-URBINA the meeting location and that "he told me 10 minutes."   CHUY then stated, "alright we need to figure out the other guy?   Where do you want me to send him?"   CS-3 told CHUY to let CS-3 complete the deal with the first guy, referring to BRENES-URBINA, and then they would figure out where to do the second part of the deal.

33.   At approximately 12:50 p.m., CS-3 received a phone call from BRENES-URBINA's -4662 number.   BRENES-URBINA told CS-3 that he was at the location and was driving a Jeep Cherokee that was "crashed."   CS-3 responded that CS-3 was standing outside the main entrance wearing a baseball hat.   CS-3 and BRENES-URBINA confirmed over the phone that they saw each other.   CS-3 directed BRENES-URBINA to park, and BRENES-URBINA parked the Cherokee on the east side of the parking lot.

34.  At about this time, Task Force Officer Alberto
Alvarado observed a Jeep Cherokee enter the parking lot and CS-3
speak with the driver through the car window.  TFO Alvarado
observed BRENES-URBINA step out of the Cherokee and greet CS-3.
Law enforcement agents could hear the conversation between
BRENES-URBINA and CS-3, as well as see the video footage from
the device CS-3 possessed.  CS-3 asked BRENES-URBINA, "how many
do you have for me, it's supposed to be 100,000, do you have
100,000?"  BRENES-URBINA responded "yes," and stated that it was
all in a box.

35.  TFO Alvarado observed BRENES-URBINA open the back-
right door of the Cherokee and reach inside.  CS-3's live video
showed BRENES-URBINA pull a cardboard box partially out of the
back seat.  CS-3 told BRENES-URBINA that CS-3 could not see
anything and wanted to get inside "to see them," referring to
the fentanyl pills.  BRENES-URBINA stepped away from car to
allow CS-3 to inspect the box.  CS-3 told BRENES-URBINA that CS-
3 had to be sure what CS-3 was taking.  Although the audio
recording is not clear, CS-3 later told me that BRENES-URBINA
agreed that CS-3 had to be sure what CS-3 was getting.  On the
live video, surveilling agents could see CS-3 holding what
appeared to be a brick-shaped object with silver metallic
wrapping.  BRENES-URBINA told CS-3, "I am going to give you 10
and another guy is going to give you 4."

36.  As can been seen on the video recording, CS-3 opened
one of the packages, revealing blue pills inside the package.
CS-3 confirmed to BRENES-URBINA that there were "10."  CS-3 then

told BRENES-URBINA, "let me make a call and let them know it's here."  TFO Alvarado observed CS-3 walk away from BRENES-URBINA, and then CS-3 called TFO Alvarado to confirm that BRENES-URBINA had the drugs.

37.  At approximately 1:00 p.m., HIDTA 48 and FPD officers arrested BRENES-URBINA in the parking lot of the Courtyard by Marriot hotel.  FPD Detective Gregory Velasquez searched BRENES-URBINA and located his identification, a California state identification card, in his front right pocket.  Investigators also determined that the Jeep Cherokee, which had California license plate 8ZZK229, was registered to "Fernando Brenes" and E.H. at 6206 St Albans, Street, Los Angeles, CA 90042.

38.  Based on law enforcement agents' observations during the transaction, CS-3's discussions with BRENES-URBINA, and CS-3's confirmation that the car contained what appeared to be approximately 100,000 blue fentanyl pills, TFO Lawrence Hayes searched the Jeep Cherokee and found a cardboard box in the back passenger seat containing approximately 100,000 blue pills imprinted with an "M" on one side and "30" on the other side.

39.  Based on my training and experience, the August 26, 2022, controlled transaction brokered by CHUY, my discussions with CS-2 and CS-3, and my discussions with Spanish-speaking agents who reviewed the communications with CHUY and BRENES-URBINA, I believe that the approximately 100,000 pills seized from BRENES-UBINA are counterfeit M-30 oxycodone pills laced with fentanyl.  I did not field-test the pills because they presumptively contain fentanyl, which can be dangerous to test.

40.   During the search of the Jeep Cherokee, TFO Hayes found an Apple iPhone ("SUBJECT DEVICE 2") in a black case in the center console, as well as two medicine bottles containing unidentified pills in the trunk of the vehicle.

41.   Detective Velasquez found a red Apple iPhone ("SUBJECT DEVICE 1") on BRENES-URBINA's person.  Based on my training and experience, as well as my discussions with Spanish-speaking agents and CS-3, I believe that BRENES-URBINA used these phones to communicate with CS-3 about the drug deal.

42.   Law enforcement agents seized the box containing the approximately 100,000 suspected fentanyl pills, the two medicine bottles containing unidentified pills, and the SUBJECT DEVICES. The suspected fentanyl pills were transported to Fullerton Police Department pending transfer to the DEA Southwest Laboratory for official testing.  The SUBJECT DEVICES are currently in DEA custody in Los Angeles.

### V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

43.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

        a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences and vehicles.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences and

vehicles, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles in the event of an unexpected opportunity to sell drugs arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

44. As used herein, the term "digital device" includes the
SUBJECT DEVICES.

45. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a. Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet. Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time. Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b. Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device. That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them. For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

46. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

47.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when

a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

       e.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BRENES-URBINA's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of BRENES-URBINA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

//

//

48.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.   <u>CONCLUSION</u>

49.   For all of the reasons described above, there is probable cause to believe that Fernando Javier BRENES-URBINA has committed a violation of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 3rd day of
February 2023.

_____
THE HONORABLE KENLY KIYA KATO
UNITED STATES MAGISTRATE JUDGE